WILLIAM J. AIMONETTE, Plaintiff-Appellant, v. JOSEPH R. HARTMANN *et al.*, Defendants-Appellees.

Second District No. 2—90—0494

Opinion filed June 7, 1991.

REINHARD, P.J., dissenting.

Thomas R. Cirignani, Stanley J. Heller, and James C. Harman, all of Thomas R. Cirignani & Associates, and Gregory R. Sun, both of Chicago, for appellant.

William V. Johnson, Thomas H. Fegan, and Pamela L. Gellen, all of Johnson, Cusack & Bell, Ltd., of Chicago, for appellee Joseph R. Hartmann.

David J. Bressler and John J. Mangan, both of Rooks, Pitts & Poust, of Wheaton, for appellees A.H.M. Medical Associates, Thomas T. Chowattukunnel, and Naperville Medical Associates.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, William Aimonette, filed a medical malpractice action against defendants, Dr. Joseph Hartmann, A.H.M. Medical Associates, Dr. Thomas Chowattukunnel, and Naperville Medical Associates, for allegedly failing to properly diagnose and treat him. Following a lengthy trial, the jury returned a verdict in favor of all defendants. Plaintiff now appeals, contending that the trial court improperly instructed the jury on the issue of plaintiff's contributory negligence and also erred in failing to tender instructions on comparative negligence. We affirm.

On August 13, 1985, plaintiff filed a complaint seeking damages for defendants' alleged medical malpractice. On August 27, 1986, Dr. Chowattukunnel filed his answer to the complaint, along with an affirmative defense alleging that plaintiff was contributorily negligent for at least a portion of his injuries. Following a lengthy discovery period, the jury trial began on January 17, 1990.

Plaintiff testified that he was an attorney who received his law degree in 1969 and was working for Sunbeam Corporation in 1980. In September 1980, plaintiff began a running program in an attempt to get back into shape. However, he was unable to jog more than one-fourth mile because he was experiencing "[s]hortness of breath and lightheadedness." On November 19, 1980, Dr. Chowattukunnel examined plaintiff because plaintiff continued to experience problems with breathing and also had chest pains. Plaintiff's chest X rays were negative, but an EKG revealed an abnormality. Plaintiff then checked into Edward Hospital for additional tests and a consultation with Dr. Hartmann, a cardiologist. Plaintiff told Dr. Hartmann that he was experiencing difficulty with his breathing, had chest pains, and also noticed a numbness in his right arm on occasion. Dr. Hartmann then ordered a treadmill EKG test. Following the test, Dr. Hartmann

informed plaintiff that nothing was wrong with him except that he was "out of shape." On November 20, 1980, plaintiff was released from the hospital.

After plaintiff was released, he and his family went to Florida for a previously scheduled vacation. During the vacation, plaintiff continued to experience problems with his breathing. Plaintiff had similar problems when he returned to work after the vacation. On December 3, 1980, plaintiff began to slur his words and called Dr. Hartmann. Plaintiff spoke to Dr. Hartmann's secretary but never received a call back from Dr. Hartmann. On December 5, 1990, plaintiff went jogging at night and suffered a stroke. He was taken to Edward Hospital via ambulance.

A few days later, Dr. Hartmann informed plaintiff that his condition was diagnosed as mitral valve prolapse syndrome and that he had suffered a stroke. Plaintiff was released from the hospital on December 24, 1990, and entered a rehabilitation center two days later.

On cross-examination, plaintiff stated that he did not tell Dr. Chowattukunnel about any numbness in his arm during the initial medical examination. Plaintiff also told Dr. Chowattukunnel that he did not want to be hospitalized on November 20, 1980, because he had a vacation in Florida already scheduled. In addition, he did not attempt to contact Dr. Chowattukunnel after he began experiencing problems with his speech a few days before he suffered the stroke.

Plaintiff presented two physicians, Dr. William Wehrmacher and Dr. Barry Singer, to testify as expert witnesses at trial. Dr. Wehrmacher, a cardiologist, testified that it was his opinion that plaintiff suffered from mitral valve prolapse syndrome which likely caused his "major cerebral vascular accident" (stroke). Dr. Wehrmacher stated that Dr. Chowattukunnel deviated from the minimum standard of care in treating plaintiff by failing to consider alternative causes of plaintiff's symptoms after ruling out the initial diagnosis. According to Dr. Wehrmacher, Dr. Chowattukunnel's deviation from the minimum standard of care "contributed" to plaintiff's stroke.

Dr. Wehrmacher further testified that it was his opinion that Dr. Hartmann also deviated from the minimum standard of care when he failed to take an adequate medical history and did not continue to monitor plaintiff following his initial discharge from the hospital.

On cross-examination, Dr. Wehrmacher testified that it was appropriate for Dr. Chowattukunnel, a general practitioner, to consult with a cardiologist, Dr. Hartmann, to assist in treating plaintiff's condition. In addition, he indicated that he could not determine within a reason-

able degree of medical certainty whether there was a connection between Dr. Chowattukunnel's treatment and plaintiff's stroke.

On redirect examination, Dr. Wehrmacher indicated that he could not specifically connect Dr. Chowattukunnel's treatment with plaintiff's stroke because there were "areas of overlap and responsibility" between the two treating physicians. Thus, it was his opinion that both physicians were responsible for plaintiff's condition to some degree.

Dr. Singer also opined that Dr. Chowattukunnel's failure to obtain a proper history of plaintiff and to evaluate plaintiff's symptoms following the November 20, 1980, discharge from the hospital were direct causes of plaintiff's subsequent stroke. In addition, he stated that Dr. Hartmann failed to meet the minimum standard of care by failing to obtain an adequate history and did not explain to plaintiff the need for further monitoring after coronary artery disease was eliminated as a diagnosis.

Dr. Chowattukunnel testified that his initial impression concerning plaintiff's symptoms was that plaintiff had "possible tracheal bronchitis" and angina. After reviewing plaintiff's EKG, Dr. Chowattukunnel noted "nonspecific changes, with history strongly suggestive of unstable angina" in plaintiff's medical record and recommended that plaintiff be admitted into the hospital for further tests. He also recommended that a cardiologist examine plaintiff. Following various tests at the hospital and after consulting with Dr. Hartmann, Dr. Chowattukunnel discharged plaintiff from the hospital. He told plaintiff to contact him when plaintiff returned from his vacation. However, plaintiff did not contact him and Dr. Chowattukunnel did not see plaintiff again until long after the stroke.

Dr. Hartmann testified that he examined plaintiff on November 20, 1980, at Edward Hospital and found no evidence of any "significant" heart disease. In addition, plaintiff did not exhibit any of the risk factors for a stroke at this time. Thus, according to Dr. Hartmann, the stroke was "[d]efinitely not" predictable. Dr. Hartmann further stated that he would have had a neurologist examine plaintiff had plaintiff informed him of any additional symptoms, including problems with his speech.

Dr. Louis Caplan, a neurologist, and Dr. James Talano, a cardiologist, testified that Dr. Hartmann complied with the standard of care in his treatment of plaintiff. In addition, Dr. Finley Brown, a family practice physician, testified that Dr. Chowattukunnel's examination and treatment of plaintiff complied with the standard of care for a family practitioner.

Dr. Ruth Ramsy, a radiologist who specializes in neurology, testified that it was her opinion that plaintiff had experienced one embolus, which she indicated was a single event.

At the conclusion of the trial, the jury heard closing arguments before deliberating and returned a verdict in favor of all defendants. Plaintiff's motion for a new trial was denied, and this appeal followed.

Plaintiff first contends that the trial court erred in instructing the jury on contributory negligence. Plaintiff argues that the instruction allowed the jury to return a finding in favor of defendants even though plaintiff may have been responsible only for a small portion of his injuries.

At issue in this case is the propriety of giving the jury Illinois Pattern Jury Instructions, Civil, No. 105.08 (2d ed. 1971) (hereinafter IPI Civil 2d). This instruction, as given in this case, stated:

> "A patient is required to follow reasonable advice as to treatment. In addition he must follow the doctor's instructions. A doctor is not liable for the consequences of a patient's failure to do so. A patient's failure to receive treatment or follow instructions does not absolve the doctor from the results of any earlier malpractice. It only absolves him from any injury caused by the patient's not accepting reasonable treatment or following instructions."

Plaintiff asserts that the portion of the instruction which indicates that "[a] doctor is not liable for the consequences of a patient's failure" to follow advice "makes it clear that plaintiff's contributory negligence bars his recovery as opposed to reducing his recovery" under comparative negligence principles. Plaintiff argues that this instruction is incompatible with the supreme court decision in *Alvis v. Ribar* (1981), 85 Ill. 2d 1.

In *Alvis*, our supreme court abolished the doctrine of contributory negligence and adopted in its place a "pure" form of comparative negligence. (85 Ill. 2d at 28.) Our legislature recently has abolished the "pure" comparative negligence system adopted in *Alvis* and replaced it with a "modified" system in which a plaintiff cannot recover damages if his or her fault is more than 50% of the proximate cause of the injury. See Ill. Rev. Stat. 1987, ch. 110, par. 2—1116.

All defendants rely on *Fisher v. Slager* (1990), 201 Ill. App. 3d 480, to support their position that the jury was properly instructed in this case. In *Fisher*, the plaintiff argued that the trial court should not have given IPI Civil 2d No. 105.08 to the jury in that medical malpractice case because there was no evidence to support the instruction. The appellate court disagreed, holding that there was evi-

dence at trial to support the defendants' theory that the decedent did not follow all of the physicians' instructions. *Fisher*, 201 Ill. App. 3d at 487.

Of more importance to the present case is the *Fisher* court's discussion of the applicability of IPI Civil 2d No. 105.08 in a comparative negligence situation. The plaintiff argued that the trial court should not have given this instruction to the jury without also providing a modified general verdict form on comparative negligence (see Illinois Pattern Jury Instructions, Civil, No. 45.07 (3d ed. 1990) (IPI Civil 3d)). The appellate court again disagreed, noting that IPI Civil 2d No. 105.08 was "solely a damage-reducing instruction" which was inapplicable in the case because the jury found in favor of all defendants. (*Fisher*, 201 Ill. App. 3d at 489.) Absent any findings of liability, the jury would have no reason to consider reducing the plaintiff's damages as provided in IPI Civil 2d No. 105.08. (*Fisher*, 201 Ill. App. 3d at 489.) The fact that the trial court also instructed the jury that it would not have to consider the question of damages for any defendant it found not liable (see IPI Civil 3d No. 36.01) further bolstered the appellate court's decision. See *Fisher*, 201 Ill. App. 3d at 489; see also *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 799 (if a defendant is guilty of no negligence, then there is "nothing to compare").

■■ We agree with the reasoning expressed in *Fisher* and likewise find that the instruction at issue in this case was properly tendered to the jury. The jury would need to consider this instruction only if it determined that one or more defendants were liable for at least a portion of plaintiff's injuries. However, the jury found in favor of all defendants on the issue of liability. Thus, the jury had no reason to consider reducing plaintiff's damages as provided in IPI Civil 2d No. 105.08.

In addition, we disagree with plaintiff's assertion that this instruction confused or misled the jury. The jury was instructed, pursuant to IPI Civil 3d No. 36.01, that if the jury decided in favor of a defendant on the question of liability, then it "will have no occasion to consider the question of damages as to that defendant or those defendants." Thus, the jurors were aware that they would only need to consider IPI Civil 2d No. 105.08 if they first determined that at least one defendant was liable for plaintiff's injuries. See *Schuchman v. Stackable* (1990), 198 Ill. App. 3d 209, 231 (alleged errors pertaining solely to question of damages do not afford grounds for reversal where a defendant is found not liable); *Mackey v. Daddio* (1985), 139 Ill. App. 3d 604, 610 (same).

Furthermore, we do not view this instruction as completely barring plaintiff from recovery if the jury finds that plaintiff did not follow his physicians' instructions. The jury instruction specifically states that plaintiff's failure to follow instructions "does not absolve the doctor from the results of earlier malpractice." Thus, the jury was aware that either physician's alleged malpractice on November 19-20, 1980, would not be absolved simply because plaintiff failed to follow instructions after he returned from his vacation.

■ Plaintiff also argues that IPI Civil 2d No. 105.08 was not used properly as a mitigation of damages instruction in this case. Plaintiff asserts that there were no damages to mitigate at the time of his initial consultation with the physicians and that there was no evidence to show that plaintiff's conduct after he was released from the hospital "in any way caused any of his injuries."

A party has a right to have the jury instructed on his or her theory of recovery or defense if the facts in evidence or a reasonable inference from those facts support that theory. (*Schuchman*, 198 Ill. App. 3d at 225; *Alden Press, Inc. v. Block & Co.* (1988), 173 Ill. App. 3d 251, 260.) We agree with defendants that there was sufficient evidence presented at trial to support this mitigation of damages instruction. Defendants presented evidence which indicated that plaintiff failed to report his new symptoms and did not return to see either of his physicians after his condition began to deteriorate. In addition, plaintiff failed to follow Dr. Chowattukunnel's instruction that he receive a follow-up examination after plaintiff returned from Florida. It is apparent that the defense theory in this case was that plaintiff did not give defendants an opportunity, after these new symptoms accrued, to treat him properly. Given that there was evidence to support this theory, the instruction was properly tendered. See *Fisher*, 201 Ill. App. 3d at 488.

■ We next consider plaintiff's contention that the trial court erred in refusing to give his tendered instructions on comparative negligence to the jury. Plaintiff cites *Leonard v. Pitstick Dairy Lake & Park, Inc.* (1990), 202 Ill. App. 3d 817, to support his position on this issue.

In *Leonard*, the plaintiff was seriously injured when he dove into shallow water in a lake which the defendants owned and operated. The appellate court reversed a jury verdict in favor of the defendants, holding that the trial court erred when it refused to instruct the jury that evidence of the plaintiff's negligence "does not bar liability but only goes to the reduction of damages." (*Leonard*, 202 Ill. App. 3d at 825.) The court noted that the jury must have been confused about

the legal effect of the evidence relating to the plaintiff's fault when no instructions were tendered on comparative negligence. 202 Ill. App. 3d at 824-25.

We find *Leonard* to be distinguishable from the facts presented in the case at bar. In this case, defendants determined that the issue was more appropriately labeled as a mitigation of damages situation and chose to withdraw instructions relating to comparative fault. The jury was not misled by the absence of comparative negligence instructions because the evidence supported defendants' theory in the case with respect to mitigation of damages. Unlike *Leonard*, the jury was given guidance as to the significance of the evidence relating to plaintiff's alleged failure to follow his physicians' advice and not reporting new symptoms.

In addition, we find no error in the trial court's decision not to allow plaintiff to tender instructions on comparative negligence. Plaintiff's position in this case was that he followed his physicians' advice and did everything he was instructed to do. Thus, instructions on comparative fault would not have been consistent with his theory of the case and the court was correct in refusing plaintiff's request to tender the instructions.

Plaintiff's final contention on appeal is that the trial court erred in failing to instruct the jury that it was defendants' burden to prove plaintiff's failure to mitigate damages. Plaintiff argues that the court's failure to tender the instruction resulted in reversible error because it misled the jury into believing that defendants did not have to prove anything at trial.

Plaintiff relies upon *Casey v. Baseden* (1986), 111 Ill. 2d 341, to support his position. In *Casey*, the court determined that the trial court properly instructed the jury that the defendants had the burden to prove the plaintiff's comparative negligence and his failure to mitigate damages. *Casey*, 111 Ill. 2d at 347. See also *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 73 (defendants have burden of proof with respect to failure to mitigate damages).

In the present case, the following colloquy occurred at the instructions conference:

> "MR. THOMAS CIRIGNANI [counsel for plaintiff]: And I would also like to submit to you a form that relates to the defendant having the burden of proof, consistent with the instruction you are going to give, 105 whatever, that he didn't follow instructions.

MR. JOHNSON [counsel for defendant Hartmann]: We have withdrawn the comparative. Plaintiff doesn't have a right to interpose a comparative.

THE COURT: I have to take a look at whatever instruction he tenders. Okay. Plaintiff's 27, which is the comparative verdict form, it was given yesterday over the objection of plaintiff. So now the plaintiff is not withdrawing it; is that right?

MR. MARIO CIRIGNANI [counsel for plaintiff]: That's right.

MR. THOMAS CIRIGNANI: Because the Court is now giving the other instruction, 105 whatever, and that is why we are asking that that instruction be given.

THE COURT: I imagine now there is an objection by the defendants?

MR. JOHNSON: Yes.

THE COURT: It will be sustained."

While the record of the instructions conference is unclear and confusing at best, it appears that defendants originally submitted instructions on comparative negligence. The trial court was unsure about the instructions but decided to tender the instructions over plaintiff's objections. However, defendants later withdrew the instructions after they withdrew their affirmative defense. Plaintiff then attempted to introduce instructions concerning comparative negligence and defendants' burden of proof. The trial court refused to allow counsel for plaintiff to submit comparative negligence instructions against his own client and sustained defendants' objections to the instructions.

■ We disagree with plaintiff's contention that the trial court committed reversible error in failing to instruct the jury on defendants' burden of proof. As *Casey* stated, any burden of proof which defendants may have had would arise "only after the jury had resolved the issue of liability in favor of the plaintiff and had found that plaintiff proved she sustained damages." (*Casey*, 111 Ill. 2d at 347-48.) However, the jury in this case did not resolve the liability issue in favor of plaintiff and thus did not award any damages. Thus, the fact that the trial court refused to instruct the jury on defendants' burden of proof in no way prejudiced plaintiff because the jury had no reason to consider any damage-reducing factors or who had the burden of proving these factors. As such, reversal is not warranted in this case. See *Alden Press*, 173 Ill. App. 3d at 260; *Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 568.

In addition, defendants withdrew their affirmative defense of plaintiff's comparative negligence and plaintiff was accordingly not

entitled to an instruction on this issue. See *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 416.

Under these circumstances, we find that the jury instructions tendered in this case, taken as a whole, were sufficiently clear so as not to mislead the jury and accurately stated the law. (See *Alden Press*, 173 Ill. App. 3d at 260.) Consequently, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

UNVERZAGT, J., concurs.

PRESIDING JUSTICE REINHARD, dissenting:
I respectfully dissent. The trial court committed reversible error when it instructed the jury pursuant to Illinois Pattern Jury Instructions, Civil, No. 105.08 (2d ed. 1971) (hereinafter IPI Civil 2d).

Where appropriate in a negligence action, the jury is normally instructed as to the plaintiff's duty to exercise ordinary care. This instruction (Illinois Pattern Jury Instructions, Civil, No. 10.03 (3d ed. 1991) (hereinafter IPI Civil 3d)) pertains to the question of whether the plaintiff has been comparatively or contributorily negligent. This is relevant in a negligence action because, under principles of contributory or comparative negligence, the plaintiff's failure to exercise due care can be a contributing proximate *cause* of his or her injury. (See *Owens v. Stokoe* (1986), 115 Ill. 2d 177, 183-84; Restatement (Second) of Torts §§463, 465 (1965).) IPI Civil 2d No. 105.08, on the other hand, is solely a damage-reducing instruction (*Fisher v. Slager* (1990), 201 Ill. App. 3d 480, 484), which is inappropriate where the real question is whether the plaintiff's negligence was a contributing cause of a single injury.

IPI Civil 2d No. 105.08 "covers only special instances of a departure from the requirement that a patient use ordinary care" which are not adequately addressed by a comparative negligence instruction. (IPI Civil 2d No. 105.08, Comment.) In my opinion, IPI Civil 2d No. 105.08 allows for mitigation of damages against a physician where the patient does not follow reasonable advice as to treatment or does not follow the physician's instructions *subsequent to the injury caused by the earlier malpractice of the physician*. The instruction is not appropriate where, as here, the only question is one of which party's conduct caused the injury: the physician's malpractice, the plaintiff's lack of due care, or some combination thereof.

The Illinois Supreme Court Committee on Jury Instructions in Civil Cases recently published a revised instruction No. 105.08 which is essen-

tially the same as the prior version. (See IPI Civil 3d No. 105.08.) The committee's notes and comments to the revised instruction make it clear that the instruction does not apply where, as here, there is only one injury and the jury must determine what portion of the injury was proximately caused by the plaintiff's comparative negligence. The notes on use for IPI Civil 3d No. 105.08 state that the instruction "applies only to those instances where the defendant claims that the plaintiff has failed to mitigate his damages by failing to use ordinary care in not seeking treatment or in not following the doctor's instructions concerning treatment." (IPI Civil 3d No. 105.08, Notes on Use.) Furthermore, the comment states that a patient's duty to mitigate his damages arises "[o]nce an injury has occurred as a proximate result of medical negligence." IPI Civil 3d No. 105.08, Comment.

In this case, no injury occurred until plaintiff suffered his stroke. The asserted failure to follow instructions occurred *before* the stroke, and such evidence would properly be raised only to compare plaintiff's negligence with that of defendants for purposes of determining the proximate cause of the stroke. Plaintiff's failure to follow instructions could have been a contributing cause of his injury, but it did not aggravate an existing injury caused by defendants' negligence. As the committee's comment to IPI Civil 3d No. 105.08 cautions, "[i]t is important *** to distinguish between mitigation of damages and contributory negligence." (IPI Civil 3d No. 105.08, Comment.) Here, the improper use of IPI Civil 2d No. 105.08 confused plaintiff's duty to mitigate damages with the separate question of whether his conduct was a contributing cause of the stroke.

Moreover, the error here was highly prejudicial to plaintiff because defendants misused IPI Civil 2d No. 105.08 by characterizing it in the context of liability in their final arguments to the jury. In this regard, defendants argued that IPI Civil 2d No. 105.08 required plaintiff to follow the doctor's instruction and that, if plaintiff did not do so, the resulting injury was not the doctor's responsibility. The attorney for Dr. Hartmann argued, in pertinent part, as follows:

> "One instruction that I will direct your attention to—even if you were to assume that all of the doctors were wrong, every doctor took an incorrect history, every expert except Dr. Wehrmacher and Dr. Singer are wrong—*plaintiff still could not be entitled to recover in this case because of his own conduct.*
>
> * * *
>
> And you will be instructed that a patient is required to follow reasonable advice as to treatment and follow the doctor's instruc-

tions, and if the patient doesn't do it, it's not the doctor's responsibility.

Now I know I am talking to a bunch of patients, potential patients, but I don't think that the law is putting an unreasonable standard on somebody. If you have something wrong with you and you are worried about it, you don't sit at home.

If you are a child or a baby or you can't think properly or—but a 36-year-old attorney, if everything that he says is true, *he is still not entitled to recover in this case because he didn't follow the advice of this doctor.* And the advice was, hey, if you have a problem, come back. And then Dr. Chowattukunnel told him to come back in 10 days anyway. And he didn't do it, and he admitted he didn't do it." (Emphasis added.)

Later in counsel's argument, he stated that he was "not even going to talk to [the jury] about damages."

Dr. Chowattukunnel's attorney also referred to IPI Civil 2d No. 105.08 in final argument:

"Further, the patient was instructed to come back. He didn't do that. Mr. Johnson has informed you of the instruction that you will be given in that regard. In fact, he never bothered to contact Dr. [Chowattukunnel] again until after he had a stroke."

Thus, it is clear that the attorneys for both Dr. Hartmann and Dr. Chowattukunnel utilized IPI Civil 2d No. 105.08 on the issue of liability, not mitigation of damages.

The most serious prejudice to plaintiff occurred when the trial court allowed defendants to withdraw their request for an instruction on plaintiff's comparative negligence and denied plaintiff's request that such an instruction be given. The exclusion of the comparative negligence instruction, combined with the erroneous use of IPI Civil 2d No. 105.08, confused the question of liability. This effectively led the jury to assess responsibility for plaintiff's injury entirely to one party or the other rather than assessing some proportion of fault to plaintiff and reducing damages accordingly under principles of comparative negligence. This constituted a *de facto* revival of contributory negligence as a bar to recovery and inevitably tainted the jury's verdict.

Because the trial court erred in giving the jury IPI Civil 2d No. 105.08, and because this error prejudiced plaintiff for the reasons stated above, I would reverse the judgment for defendants and remand the cause for a new trial.